The undersigned have reviewed the Award based upon the record of the proceedings before the deputy commissioner.
The appealing party has shown good grounds to reconsider the evidence. However, upon much detailed reconsideration of the evidence as a whole, the undersigned reach the same facts and conclusions as those reached by the deputy commissioner, with some minor modifications. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate award.
Accordingly, the Full Commission find as fact and conclude as matters of law the following, which were entered into by the parties in an executed Pre-Trial Agreement, as
 STIPULATIONS
The parties submitted a Pre-Trial Agreement at the initial hearing. That agreement, along with its attachments, is incorporated herein by reference. The following parts of the agreement are set out as follows:
1. The parties are properly before the Industrial Commission. The Industrial Commission has jurisdiction of the parties and the subject matter, and the parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At all relevant times herein, there existed between the decedent and defendant-employer the relationship of employer-employee.
3. The defendant-employer is an approved self-insured, with Consolidated Administrators, Inc., acting as the servicing agent.
4. That plaintiff's average weekly wage at the time the alleged incident was enough to generate the maximum compensation rate allowed by the North Carolina Industrial Commission.
5. James W. Horton died on the premises of the employer on October 10, 1994, as a result of a gunshot wound. He was survived by his wife, Sandra W. Horton, and his minor children, James W. Horton, Jr. and Sandra Ashley Horton.
6. The issues to be determined are as follows:
 a. Whether James W. Horton died as a result of an injury he sustained while in the course and scope of his employment with defendant?
b. If so, to what benefits are his dependents entitled?
 **********
Based upon all of the competent, credible, and convincing evidence adduced at the initial hearing and from the record, the undersigned make the following
 FINDINGS OF FACT
1. Decedent was forty-four years old at the time of his death. He and his wife were the owners of the defendant-employer.
2. Decedent was found dead in the shop area of the building at which defendant-employer conducted its business. He was found by one of his employees, Mr. James L. Lax. The cause of his death as determined by the North Carolina Medical Examiner was a gunshot wound to the chest.
3. Decedent and his wife had purchased the defendant business approximately two years prior to his death. Defendant-employer was a plumbing and heating contractor, and decedent had no prior experience in that field.
4. The defendant-employer had been placed into bankruptcy approximately one year prior to decedent's death. The business was in substantial debt as a result of not being able to pay its creditors. In fact, decedent had borrowed, and never repaid, approximately $23,000.00 from Mr. Lax in order to meet payroll.
5. James Lee (Jimmy) Lax testified that decedent was paying himself at least $1,500.00 per week as salary, and decedent would pay himself first.
6. Decedent died from a contact gunshot wound, meaning that the wound was inflicted with the barrel of the gun either against his shirt or skin. The bullet traveled down through the decedent's chest, indicating that the gun was pointed down when fired.
7. There was no clear or convincing indication of how long decedent survived after being shot. This question was not posed to the medical examiner. Further, there was no indication that decedent had struggled with anybody.
8. David L. Deberry was the detective with the Guilford County Sheriff's Department assigned to this case. It was his opinion that decedent had committed suicide due to the severe financial difficulty of the company, which was the sole source of income for decedent and his family.
9. Detective Deberry's opinion was based upon decedent's financial condition along with the fact that he could not come up with any leads that would indicate that anybody else had any motive to kill decedent. Additionally, decedent had traces of powder residue on his hand.
10. Detective Deberry found a gun on top of and at the rear of a box, which was on the top of a shelf and next to a wall and which was some 12 to 13 feet above the floor and to the rear of the location of decedent's body. He theorized that after the decedent shot himself, he tossed the gun with his right hand across his left shoulder up onto the box and shelf. Neither Detective Deberry, nor anybody else, measured the height of the shelf upon which the gun was found. Further, there were no measurements taken of the distance of the gun from the body.
11. The gun was not found on the initial search but was found on the next day. When the gun was found it was wrapped in a shirt and a cleaning cloth. There was no indication that the shirt had any gun powder residue on it which would be consistent with the gun being wrapped in it at the time it was discharged. The gun was found in a location that could not be seen from the floor or a step ladder.
12. Prior to the gun being fired, it had been wrapped in a cleaning cloth. The cloth had gun powder residue on it that was consistent with the gun being fired while wrapped within the cloth.
13. After decedent was shot, the gun was wrapped in the shirt and thereafter thrown or placed on top of the box on the shelf, where it was later found.
14. Detective Deberry was of the opinion that decedent was on his knees at the time he was shot, because there was no blood found on decedent's clothes below his waist. He also thought that the decedent did not move nor had his body been moved, after being shot because if he had, the blood as it had been disbursed would have been smeared. The detective did not see any indication that any of the blood had been smeared.
15. The decedent's body was found lying in a pool of blood.
16. Decedent had gun powder residue in the web of his hand and on the back of his hand that was consistent with his holding the gun in a normal fashion at the time of its discharge. The gun powder pattern on decedent's hand was also consistent with his hand being in the area of the gun when it discharged.
17. William S. Best of Forensic Analytical Services and Testing was of the opinion that the pattern of powder disbursement was consistent with either decedent shooting himself or with somebody else shooting decedent.
18. Detective Deberry said that decedent's arms did not move after he was shot and that the decedent did not move otherwise. If decedent did not move his arm after being shot, it would have been impossible for him to wrap the gun in the shirt and then throw it on top of the box on the shelf.
19. When viewing the evidence as presented by Detective Deberry, one is left with an unclear picture of what happened and with unanswered questions as to how decedent was shot. If one believes Detective Deberry, then decedent should have smeared blood when he threw the gun up over his left shoulder, which did not happen. There is a remaining question of whether decedent could have lived long enough to wrap the gun in the shirt it was found in and then to throw it on top of the box and shelf which cannot be clearly or convincingly answered. Further, it cannot be clearly or convincingly answered whether the gun was wrapped in the shirt after decedent shot himself or whether he was shot by somebody else.
20. In the Medical Examiners report, it is indicated that decedent fell after being shot from a standing position, and not from a kneeling position. Also the autopsy revealed that the bullet, upon entry into the decedent's body, pierced the left lung and the left side of the heart, lodging in the soft tissue of decedent's back.
21. There was no attempt made to determine if there were any fingerprints on the gun.
22. Neither Detective Deberry, nor anybody else, found a suicide note.
23. When Detective Deberry asked the decedent's family and co-workers (employees), nobody had any indication that decedent was depressed or suicidal. Decedent's medical history did not have any indication that he had a history of depression or mental illness.
24. Detective Deberry felt that it was apparent that the decedent had been working in his office at some point prior to his death.
25. There was no indication that the building had been broken into by force.
26. A review of all the competent, credible, and convincing evidence offered in this matter leaves one with a lot of questions and no answers of what really happened at the time the gun discharged and who pulled the trigger.
27. It is clear that no one knows for sure how or by whom decedent was shot. It is clear that the undersigned cannot accept the facts as Detective Deberry would have us to believe, because they are not consistent with the medical examiners report. For example, on one hand, Detective Deberry believes that decedent shot himself and after doing so, wrapped the gun in a shirt and threw it over his left shoulder with his right hand and arm. However, on the other hand, he also believes that decedent did not move his arms after being shot.
28. Decedent's wife, Sandra W. Horton, and two minor children, James W. Horton, Jr. and Sandra Ashley Horton, were dependent upon decedent for support and maintenance at the time of his death. James W. Horton, Jr. was born on November 11, 1978, and Sandra Ashley Horton was born on December 29, 1979.
 **********
Based upon the foregoing stipulations and findings of fact, the undersigned make the following
 CONCLUSIONS OF LAW
1. In cases like this, when an employee is found dead at his place of work, there is the presumption that the employee died by accident while in the scope and course of employment and without anything to the contrary, the claim is compensable, Pickrellv. Motor Convoy, Inc., 322 N.C. 363, 368 S.E.2d 582 (1988). Here, the defendant has failed to sufficiently or convincingly rebut the presumption in that it has not offered any credible or convincing evidence to the contrary. Defendant has offered some evidence, but due to numerous inconsistencies and unanswered questions, the evidence offered is not credible or convincing and is not accepted as fact in this matter to the extent that defendant would be able to sufficiently rebut thePickrell presumption.
2. The decedent died as a direct result of an accident sustained while in the course and scope of his employment with the defendant-employer. Id.; G.S. § 97-2.
3. Decedent's wife, Sandra W. Horton, and his two minor children, James W. Horton, Jr. and Sandra Ashley Horton, were dependent upon him at the time of his death and are entitled to recover compensation under the North Carolina Workers' Compensation Act for his death. G.S. § 97-38; § 97-39.
 ********** AWARD
1. Defendant shall pay compensation to Sandra W. Horton, James W. Horton, Jr. and Sandra Ashley Horton at the rate of $155.33 per week for 400 weeks beginning October 10, 1994. Payments shall continue to be made to Sandra Ashley Horton and James W. Horton, Jr., for 400 weeks. As both dependent minor children have reached the age of majority at this time, compensation that is still due as well as that which has accrued, may be paid directly to them. The portions of the compensation which have already accrued shall be paid in a lump sum, subject to the attorney's fees hereinafter approved.
2. Defendant shall pay all medical expenses, if any, incurred by reason of the injury to, and death of, the decedent when bills for the same have been submitted to and approved by the Industrial Commission.
3. Defendant shall pay burial expenses not to exceed $2,000.00 to the person or persons entitled thereto.
4. An attorney's fee in the amount of twenty-five percent of the compensation awarded is approved for plaintiffs' counsel, and shall be deducted from accrued amounts and paid directly to plaintiffs' counsel. Further, plaintiff's counsel shall receive directly each fourth check of the compensation due plaintiffs.
5. Defendant shall pay the costs of this action.
IT IS FURTHERMORE ORDERED that this case be REMOVED from the Full Commission hearing docket.
This the __________ day of ___________________, 1998.
 S/ ________________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/ __________________ BERNADINE S. BALLANCE COMMISSIONER
S/ ______________ LAURA K. MAVRETIC COMMISSIONER
JHB/kws